# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH V. FISHER,<br><br>*Plaintiff*,<br><br>v.<br><br>PENSION BENEFIT GUARANTY<br>CORPORATION,<br><br>*Defendant*. | Civil Action No. 14-1275 (RDM) |

## MEMORANDUM OPINION

This is an action brought under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*,

to recover unpaid retirement benefits regulated by the Employee Retirement Income Security Act

of 1974 ("ERISA"). ERISA establishes certain limitations on the payment of retirement benefits

by failing plans. An administrator of such a plan—known as a "distressed" plan—is barred from

making payments other than in the order established by the statute, and from making lump-sum

payments of any kind. 29 U.S.C. §§ 1341(c)(3)(D), 1344. But the text of ERISA states that such

limitations apply only once the administrator provides notice that the plan will be terminated. *Id.*

§ 1341(c)(3)(D)(i)(I). This case is about the administrator's obligations in the period *before* it

provides notice of termination.

Plaintiff Joseph Fisher is a former executive of a corporation that sponsored a retirement

plan governed by ERISA. He requested a lump-sum benefits payment several months before the

plan administrator submitted formal notice of its intent to terminate the plan. The administrator

denied Fisher's request on the ground that "applicable law prohibits the payment of lump sum

distributions in anticipation of the termination of the Plan." The plan was terminated, and the

Pension Benefit Guaranty Corporation ("PBGC") took over as trustee.  Fisher submitted another request for a lump-sum benefits payment, which the PBGC again denied, citing a PBGC policy. Fisher now brings this action, arguing that the PBGC should have honored his request for a lump-sum payment of his retirement benefits.

This matter is before the Court on the parties' cross-motions for summary judgment. Because the Court concludes that the PBGC Appeals Board failed to justify its decision not to honor Fisher's request for a lump-sum payment, it will **REMAND** the matter to the agency for further proceedings.

## I.  BACKGROUND

### A.    Statutory and Regulatory Background

In 1974, animated by concerns over the growth in size and the unregulated state of the employee benefit plan sector, Congress passed the Employee Retirement Income Security Act ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (codified at 29 U.S.C. § 1001 *et seq.*).  "Among the principal purposes of this 'comprehensive and reticulated statute' was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits . . . ."  *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (quoting *Nachman Corp. v. PBGC*, 446 U.S. 359, 361–62 (1980)).  In order to accomplish this purpose, Title IV of ERISA created a plan termination insurance program, administered by the PBGC.  *Id.*; *see* 29 U.S.C. § 1301 *et seq.* That program protects plan participants "by guaranteeing a class of 'nonforfeitable benefits,' reimbursing eligible participants or beneficiaries when a guaranteed plan terminates without sufficient funds."  *Davis v. PBGC*, 734 F.3d 1161, 1164 (D.C. Cir. 2013) (quoting 29 U.S.C. § 1322(a)).  The basic premise of this program is that "if a worker has been promised a defined

pension benefit upon retirement[,] . . . he actually will receive it." *Nachman Corp.*, 446 U.S. at 375.

One central function of Title IV is to facilitate the orderly wind-down of retirement plans that cannot meet their payment obligations. Such a retirement plan can enter into what is known as a "distress termination" if the PBGC finds that it has "insufficient assets to satisfy its pension obligations." *Davis*, 734 F.3d at 1164; 29 U.S.C. § 1341(c). A plan in distress must provide sixty days' notice to all affected parties, including participants and the PBGC—an event known as a "notice of distress termination." *Id.* § 1341(a)(2), (c)(3)(D)(i)(I). Once the plan has provided such notice, the PBGC determines whether the plan has sufficient assets to pay all, some, or none of its liabilities. *Id.* § 1341(c)(3)(A)–(C). If the PBGC determines that the plan lacks the assets to pay all liabilities that are guaranteed by Title IV, "the PBGC becomes trustee of the plan, taking over the plan's assets and liabilities." *PBGC v. LTV Corp.*, 496 U.S. 633, 637 (1990); 29 U.S.C. § 1341(c)(3)(B)(iii). In order to pay those benefits guaranteed by ERISA, the PBGC "uses the plan's assets to cover what it can," but "then must add its own funds to ensure payment of most of the remaining . . . benefits." *LTV Corp.*, 496 U.S. at 637.

Because such plans do not have the resources to meet their obligations, ERISA imposes certain limitations on what a plan administrator (and the PBGC) may pay the participants of a distressed plan. Most basically, ERISA "guarantees" only a portion of the benefits to which participants would have been entitled to under a plan.[1] *See* 29 U.S.C. § 1322. ERISA also

---

[1] Specifically, the statute limits "guaranteed" benefits to a monthly payment "equal to the lesser of" (a) an employee's "average monthly gross income from his employer" during the 5-year period in which he was most highly compensated or (b) "$750 multiplied by a fraction" that is indexed to the contribution and benefit base set out at 42 U.S.C. § 430. 29 U.S.C. § 1322(b)(3). The PBGC represents (and Fisher does not contest) that the benefits guaranteed at the time of Fisher's plan's termination were $3,698.86 per month. Dkt. 17-1 at 9.

establishes a priority order under which a plan administrator (or the PBGC) shall pay participants if the plan has sufficient assets to pay *guaranteed* benefits, but not enough to pay *all* benefits. *Id.* § 1344(a). ERISA imposes several other restrictions on the benefits payable by an administrator of a plan entering into a distress termination (or by the PBGC). For instance, the statute states that any benefits that result from an amendment to a plan that was executed within five years of the date on which the plan terminated shall be "phased in" over the course of five years, not honored as provided in the plan document. *Id.* § 1322(b)(1), (7). The purpose is to protect the PBGC—and the plan's beneficiaries as a whole—from amendments that increase the benefits made payable to some (but not all) beneficiaries in the period of time immediately preceding a plan's termination.

At issue in this case are the statutory provisions that govern the payment of benefits by a plan entering into a distress termination. ERISA imposes certain payment restrictions that take effect "on the date on which the plan administrator provides a notice of distress termination to the" PBGC. *See id.* § 1341(c)(3)(D)(i)(I). The administrator of such a plan is prohibited from paying benefits except those "guaranteed by the [PBGC]" under 29 U.S.C. § 1322 and those "to which assets are required to be allocated" under 29 U.S.C. § 1344. *Id.* § 1341(c)(3)(D)(ii)(IV). Most significantly, for present purposes, the administrator of a plan entering into a distress termination is also required to "pay benefits attributable to employer contributions, other than death benefits, *only in the form of an annuity*." *Id.* § 1341(c)(3)(D)(ii)(II) (emphasis added). These provisions, which were enacted in 1986 as part of a revision to ERISA, were meant "to increase the likelihood that participants and beneficiaries . . . will receive their full benefits" by ensuring that the limited resources of a distressed plan were allocated for the benefit of all participants. H.R. Rep. No. 99-241, pt. 2, at 27 (1985), as *reprinted in* 1986 U.S.C.C.A.N. 685,

685. The provision limiting the lump-sum distribution of plan assets, in particular, was enacted in response to congressional concern that such distributions "would dilute plan assets and may adversely affect participants' benefits under Title IV and the PBGC's recovery." *Id.* at 50.

The PBGC has promulgated regulations and policies to implement Title IV. It has promulgated regulations that mirror § 1341's prohibition on paying lump-sum benefits. *See* 29 C.F.R. § 4041.42(b)(2) (prohibiting plan administrators from "[p]aying benefits attributable to employer contributions, other than death benefits, in any form other than as an annuity," as of "the first day [the administrator] issues a notice of intent to terminate"). It has also promulgated regulations that prohibit administrators from allocating plan assets "upon plan termination in a manner other than that prescribed in" 29 U.S.C. § 1344, and that provide that "a distribution . . . of assets . . . made in anticipation of plan termination[] is considered to be an allocation of plan assets upon termination." *Id.* § 4044.4(a), (b). It has even promulgated regulations that bar the PBGC itself from paying benefits as a lump sum, at least in most circumstances. *Id.* § 4022.7(a). Finally, the PBGC has adopted an internal policy under which it will not pay out a request for a lump-sum payment made to a plan in distress "even if [the request] was received *before* the date of the Notice of Intent to Terminate." Dkt. 24-1 at 125 (Administrative Record ("A.R.") 53 at 3) ("Policy 5.4-9") (emphasis added).

## B.     Facts and Proceedings

Fisher is a former executive of the Penn Traffic Company, a corporation that operated a chain of supermarkets throughout the Mid-Atlantic and New England. *See* Compl. ¶ 7. Until it declared bankruptcy in 2003, Penn Traffic operated a retirement plan known as the Penn Traffic Plan. *See* Dkt. 24-1 at 3 (A.R. 2 at 2) ("Appeals Board Decision"); *id.* at 47 (A.R. 3, Ex. 9, at 1). In 2002, Penn Traffic adopted an amendment to the plan in order to increase the benefits owed to

Fisher under the plan. *Id.* at 9 (Appeals Board Decision, Encl., at 1). The amendment, known as the Second Amendment, provided Fisher with an immediate credit to his retirement account "in the amount of $318,449," as well as subsequent annual credits of over $100,000. *Id.* at 10 (Appeals Board Decision, Encl., at 2). The Plan permitted employees, including Fisher, to withdraw benefits in the form of a lump-sum payment upon retirement. *Id.* at 162 (A.R. 55 at 27) ("Plan").

In May 2003, Penn Traffic filed for Chapter 11 bankruptcy. *Id.* at 47 (A.R. 3, Ex. 9, at 1). Fisher resigned on August 15, 2003. *Id.* at 19 (A.R. 3, Ex. 1, at 1). Upon his resignation, he requested that the plan administrator pay his accrued benefits as a lump sum. *Id.* On September 29, 2003, Penn Traffic's Board of Directors voted to terminate the Penn Traffic Plan. *Id.* at 30 (A.R. 3, Ex. 4, at 4). Given the impending termination, the Board also directed the committee that administered the Plan to "deny and reject" Fisher's pending request for benefits in the form of a lump-sum payment. *Id.* The committee informed Fisher by letter on October 17, 2003, that his request for a lump-sum benefits payment had been denied. *Id.* at 21 (A.R. 3, Ex. 2, at 1). It explained that "applicable law prohibits the payment of lump sum distributions in anticipation of the termination of the Plan." *Id.* Fisher appealed the committee's denial of his request, but his appeals were never adjudicated. *Id.* at 35 (A.R. 3, Ex. 6, at 1). On November 19, 2003, over a month after Fisher was notified that his request for a lump-sum distribution was denied, Penn Traffic submitted its notice of intent to terminate to the PBGC. *Id.* at 86 (A.R. 13 at 2).

The PBGC sent Fisher a letter on December 16, 2009, explaining that it had calculated his monthly benefits at $452.77. *Id.* at 100 (A.R. 32 at 1). The PBGC's calculation was based on its conclusion that the Second Amendment had not been properly executed and that Fisher was accordingly not entitled to the benefits he had been awarded in 2002. *Id.* at 6 (Appeals

Board Decision at 5).  Fisher appealed.  *Id.* at 12 (A.R. 3).  He argued that the PBGC had erred in

excluding the benefits provided in the Second Amendment.  *Id.* at 16–17 (A.R. 3 at 5–6).  But he

also argued that he was entitled to a lump-sum payment of his retirement benefits under the plan,

and that nothing in ERISA permitted the plan administrator (or the PBGC) to deny him such a

payment.  *Id.* at 15–16 (A.R. 3 at 4–5).  Specifically, Fisher argued, first, that 29 U.S.C. §

1341(c)(3)(D)(i)(I), which prohibits the payment of lump-sum benefits beginning "on the date on

which the plan administrator provides a notice of distress termination" to the PBGC, did not bar

a lump-sum payment because Penn Traffic had denied his request *before* it submitted a notice of

distress termination to the PBGC.  *Id.* at 15 (A.R. 3 at 4).  Fisher also argued that 29 C.F.R. §

4044.4(b), which prohibits the distribution of assets "in anticipation of plan termination" in a

manner not consistent with ERISA, did not bar a lump-sum payment because the regulation was

*ultra vires* and, in any event, inapplicable under the circumstances.  *Id.* at 15–16 (A.R. 3 at 4–5).

   The PBGC Appeals Board issued its decision on September 19, 2011.  *Id.* at 2.  It held

that Fisher was entitled to the increased benefits that had been awarded in the Second

Amendment, but that he was not entitled to a lump-sum payment of benefits.  *See id.* at 4–7

(Appeals Board Decision at 3–6).  In reaching this decision, the Appeals Board relied exclusively

on 29 U.S.C. § 1341 and the regulations and policy that implement it.  The Appeals Board

explained that both 29 U.S.C. § 1341(c)(3)(D) and 29 C.F.R. § 4041.42(b)(2) "state[], in general,

that a plan administrator cannot pay benefits in a form other than an annuity after it issues a

Notice of Intent to Terminate ('NOIT') the plan to PBGC."  *Id.* at 4 (Appeals Board Decision at

3).  And the Appeals Board quoted at length from Policy 5.4-9, which specifically states that

"PBGC will not accept a plan application to pay a benefit in a lump sum . . . *even if it was*

*received before the date of the* [*NOIT*]."  *Id.* at 5 (Appeals Board Decision at 4) (emphasis

7

added).  The Board stated that Policy 5.4-9 "is dictated by a straightforward reading of" the

statute and the regulation.  *Id.*  It explained:

> Both the law and the regulation provide a black-line rule in the case of distress
> terminations, to wit, if the plan administrator did not make a lump-sum
> distribution of a participant's benefit before the NOIT date, the plan administrator
> cannot thereafter make a lump-sum distribution of the participant's benefit.
>     As the Penn Traffic Plan's former administrator could not make a lump-
> sum distribution of Mr. Fisher's benefit at any time after the NOIT date, no lump-
> sum distribution was due and payable as of the Plan's termination date.  Thus,
> while PBGC will generally pay benefits that were due and payable as of a plan's
> termination date as pre-termination-liability payments if a plan's assets are
> sufficient to pay them, in your client's case, PBGC cannot pay your client a lump-
> sum benefit because no lump-sum benefit was due and payable to him as of the
> Plan's termination date.

*Id.* at 5–6 (Appeals Board Decision at 4–5).  The Appeals Board did not mention the fact that

Penn Traffic had already denied Fisher's request for a lump-sum payment by the time it issued

its notice of intent to terminate.  Nor did it discuss the application and validity of 29 C.F.R.

§ 4044.4(b).

Fisher timely filed this action challenging the Appeals Board's decision, Dkt. 1, and the

parties then filed cross-motions for summary judgment, Dkts. 16, 17.  Fisher also filed a motion

for relief under Federal Rule of Civil Procedure 56(d), Dkt. 19, arguing that the Court should

permit additional discovery rather than accept certain arguments made by PBGC in its motion.

The motions are now fully briefed.

## II.  LEGAL STANDARD

This suit arises under Section 706(2)(A) of the APA, which precludes agency action that

is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See* 5

U.S.C. § 706(2)(A).  That provision sets out "[t]wo distinct but potentially overlapping standards

of . . . review."  *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2012).  Under the first, agency actions

will be set aside if they are not "the product of reasoned decisionmaking."  *Id.* at 74–75; *see also*

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Although arbitrary and capricious review is "fundamentally deferential," *see Fox*, 684 F.3d at 75, the APA nonetheless requires not only that "an agency's decreed result be within the scope of its lawful authority," but also that "the process by which it reaches that result . . . be logical and rational," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). It is well established that even agency action that is "well within the agenc[y's] scope of authority" will be set aside if it is "not supported by the reasons that the agenc[y] adduce[s]." *Id.*; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[C]ourts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review.").

Under the second standard of review, agency actions will be set aside if they are contrary to law—if, in other words, they are not "authorized by the statutory text." *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006). To guide judicial review of an agency's statutory interpretation, the Supreme Court has set out interpretive standards under which courts often "accord substantial deference to an agency's interpretation of both a statute it administers and its own implementing regulations." *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1135 (D.C. Cir. 2014); *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, a reviewing court "must give effect to an agency's . . . reasonable interpretation of an ambiguous statute," *Christensen v. Harris Cnty.*, 529 U.S. 576, 586–87 (2000), presuming that the agency's interpretation is set out in a manner sufficiently formal and authoritative to warrant that deference, *see United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2000). If it is not, the agency's interpretation "is 'entitled to respect' only to the extent it has the 'power to persuade.'" *Gonzales*, 546 U.S. at 256 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). And under *Auer v. Robbins*, 519 U.S. 452, 461 (1997), a reviewing court must defer to an agency's

interpretation of its own regulation unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Id.*

### III.  DISCUSSION

Fisher raised two arguments before the Appeals Board: (1) that 29 U.S.C. § 1341, which prohibits a plan administrator from paying lump-sum benefits beginning "on the date on which the plan administrator provides a notice of distress termination" to the PBGC, did not bar a lump-sum payment because Penn Traffic had denied his request *before* it submitted a notice of distress termination to the PBGC; and (2) that 29 C.F.R. § 4044.4, which prohibits the distribution of assets "in anticipation of plan termination" in a manner not consistent with ERISA, did not bar a lump-sum payment because the regulation was *ultra vires* and, in any event, inapplicable under the circumstances.  Dkt. 24-1 at 15–16 (A.R. 3 at 4–5).  The Appeals Board responded only to the first argument.  *See id.* at 4–6 (Appeals Board Decision at 3–5). The Court will begin with that argument.

### A.    Section 1341(c)

Section 1341(c) requires a plan administrator to "pay[] benefits attributable to employer contributions, other than death benefits, only in the form of an annuity" during the interim period beginning "on the date on which the plan administrator provides a notice of distress termination to the" PBGC.  29 U.S.C. § 1341(c)(3)(D)(i)(I), (ii)(II).  Fisher argued before the Appeals Board, and he argues here, that this provision does not permit a plan administrator to deny a request for lump-sum payment *before* the administrator provides formal notice to the PBGC.  The Appeals Board rejected that argument, relying principally on an internal PBGC policy.  That policy provides that the PBGC "will not accept a plan application to pay a benefit in a lump sum received by the plan administrator before [the date the plan is terminated]—even if it was

received before the date of the Notice of Intent to Terminate." Dkt. 24-1 at 125 (Policy 5.4-9 at 3). The PBGC argues that this policy represents a reasonable interpretation of § 1341, which forbids the plan administrator from making *any* payments of lump-sum benefits after it submits its notice of termination to the PBGC—and does not differentiate between requests for such payments made *before* the notice is submitted and those made *after* the notice is submitted.

Both parties frame this case as a facial challenge to the validity of that policy. *See* Dkt. 16 at 13 (arguing that "the PBGC's internal policy contradicts ERISA"); Dkt. 17-1 at 21 (stating that the question here is "whether PBGC must pay a lump sum to a participant who elected that form of benefit before an NOIT was issued"). The PBGC argues that the statute is silent as to whether a participant who requests a lump-sum payment *before* a plan administrator submits a notice of distress termination is entitled to such a payment *after* the administrator submits the notice, and that its policy (denying payment under such circumstances) rests on a reasonable interpretation of the statute that is consistent with congressional intent. That may be true. As the PBGC observes, the purpose of the prohibition on lump-sum distributions was to prevent such distributions from "dilut[ing] plan assets" and "adversely affect[ing] participants' benefits under Title IV," H.R. Rep. No. 99-241, pt. 2, at 50, a purpose that is implicated equally by distributions requested before a plan administrator provides formal notice as by those that are requested after. If this case were no more than a facial challenge to the validity of the policy, the Appeals Board's decision (which effectively restated and applied the policy) might be sufficient to withstand challenge.

The problem for the PBGC is that Fisher's case does not fall within the plain terms of the policy: while the policy states that requests submitted *before* the plan administrator submits a notice of distress termination may be denied *after* the notice is submitted, in this case the request

11

was not only submitted but also *denied* before the plan administrator submitted its termination

notice to the PBGC.  The Appeals Board decision applying the policy in such a case, moreover,

stands in at least some tension with the statute, which provides that an administrator must deny

such a request *after* it "provides a notice of distress termination to the" PBGC.  *See* 29 U.S.C.

§ 1341(c)(3)(D)(i)(I).  Thus, even if the statute permits the post-notice denial of a pre-notice

request, it arguably cannot be read to permit the *pre*-notice denial of a pre-notice request.  If the

policy is read to encompass such a request, under this argument, it is inconsistent with ERISA

and cannot be sustained.

The Appeals Board's decision suggests that the PBGC reads the statute to permit such a

result.  But the decision does not explain why.  It states only that the PBGC policy, which itself

does not address the distinction presented here, "is dictated by a straightforward reading of" the

statute and PGBC's regulations.  Dkt. 24-1 at 5 (Appeals Board Decision at 4).  But even if the

Appeals Board is correct that § 1341(c) sets out a "black-line rule" permitting a plan

administrator to deny a request for a lump-sum benefit after it submits a notice of distress

termination, regardless of when the request was made—that is, even if Policy 5.4-9 reflects the

correct (or a permissible) interpretation of § 1341—neither the policy nor the decision speaks to

whether an administrator may *deny* such a request *before* submitting a notice of distress

termination.  The decision does not note the distinction—nor the incongruity between its

conclusion and the text—at all.  The PBGC may view a pre-notice denial as consistent with the

purpose of § 1341(c), if not its plain text.  It may even be right.  But it cannot identify anything

in the Appeals Board decision, or in the policy, that even attempts to reconcile the Appeals

Board's conclusion and the text of § 1341(c).

**B.      Section 4044.4(b)**

While the Appeals Board's decision fails to address potentially dispositive aspects of the § 1341(c) issue, it wholly ignores whether and how 29 C.F.R. § 4044.4 might apply to Fisher's claim. That regulation prohibits a plan administrator from allocating plan assets "upon plan termination in a manner other than that prescribed in" 29 U.S.C. § 1344. 29 C.F.R. § 4044.4(a). But it also states that a "distribution, transfer, or allocation of assets to a participant . . . *made in anticipation of plan termination*[] is considered to be an allocation of plan assets upon termination." *Id.* § 4044.4(b) (emphasis added). The parties both operate on the assumption that a lump-sum payment to Fisher would have violated 29 U.S.C. § 1344 if it had been made "upon termination." *See* Dkt. 17-1 at 19 n.7, 24; Dkt. 18 at 13–15. But they disagree as to whether 29 C.F.R. § 4044.4(b), which treats a payment or allocation "made in anticipation of plan termination" identically as a payment made upon termination, represents a lawful exercise of the PBGC's authority, and, if so, whether it applies here. *Id.*

The validity and applicability of § 4044.4(b) would seem to be critical issues in this case. Penn Traffic, in denying Fisher's request for a lump-sum benefits payment, used language virtually identical to the regulation. *See* Dkt. 24-1 at 21 (A.R. 3, Ex. 2, at 1) ("[A]pplicable law prohibits the payment of lump sum distributions *in anticipation of the termination of the Plan* . . . ." (emphasis added)). And Fisher raised the issue of § 4044.4 at length in his letter brief to the Appeals Board, arguing that the regulation was *ultra vires* and, in any event, inapplicable to his case. *Id.* at 15–16 (A.R. 3 at 4–5). The Appeals Board decision, however, did not discuss or even mention the regulation. The Court can only speculate as to why the Appeals Board failed to address one of Fisher's two principal arguments. It is possible that it viewed Fisher's appeal as controlled by 29 U.S.C. § 1341 and the PBGC's policy implementing it. If so, its conclusion cannot stand for the reasons discussed above—namely, that § 1341 does not, on its

face, address circumstances where the plan administrator has *denied* a request for a lump-sum

distribution *before* "provid[ing] a notice of distress termination," 29 U.S.C. § 1341(c)(3)(D)(i)(I),

and the Appeals Board offered no analysis of how § 1341 might apply in such a case.  It is also

possible that the Appeals Board viewed itself as lacking the authority to entertain a challenge to

the *validity* of § 4044.4(b).  But it did not say so, and, in any event, Fisher also raised a challenge

to the *applicability* of § 4044.4(b), a question well within the Board's expertise.  Whatever the

reason the Appeals Board declined to reach the issue, the Court cannot evaluate the potential

impact of § 4044.4(b) on Fisher's claim in the absence of the agency's considered opinion on the

matter.  *See Boivin v. U.S. Airways, Inc.*, 446 F.3d 148, 155 (D.C. Cir. 2006).

## C.      Remand

Because the PBGC Appeals Board failed to address the distinction between pre-notice

and post-notice denials—a distinction critical to the applicability of § 1341—and did not address,

much less adjudicate, Fisher's challenge to 29 C.F.R. § 4044.4(b), the Court concludes that the

Board's decision must be set aside and this case remanded to the agency for further proceedings.

*See Fox*, 684 F.3d at 80 ("pursu[ing] a course of prudence" and "remand[ing] the case to the

Department for reconsideration"); *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco,*

*Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006) (same).  The Appeals Board may be

correct that Fisher is not entitled to a lump-sum payment of his retirement benefits.  But it is a

cardinal rule of judicial review that the Court "cannot exercise [its] duty of review unless [it is]

advised of the considerations underlying the action under review."  *Chenery*, 318 U.S. at 94; *see*

*also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a

determination or judgment which an administrative agency alone is authorized to make, must

judge the propriety of such action solely by the grounds invoked by the agency.").  The Appeals

Board decision simply does not supply reasons sufficient for the Court to consider, much less to ratify. The matter must be remanded for consideration of the issues discussed above.

The PBGC offers two reasons why the Court need not remand the matter but neither is persuasive. First, it asserts that the Court should defer to the Appeals Board's decision under *Chevron*. Dkt. 17-1 at 20; Dkt. 23 at 7–8. But even if the Appeals Board's decision would ordinarily warrant *Chevron* deference, a question the Court need not decide, *see Fox*, 684 F.3d at 77–78 (outlining factors relevant to the determination whether an informal adjudication warrants such deference), it is clear that the Appeals Board's decision in this case does not. An agency's unreasoned adjudication of a question of law does not warrant deference of any sort. *See Tripoli*, 437 F.3d at 77 ("We . . . owe no deference to ATFE's purported expertise because we cannot discern it."). And even if the Court owed *Chevron* deference to the Appeals Board's decision, it would fail at *Chevron*'s second step, under which courts defer "only if the agency has offered a reasoned explanation for why it chose [its] interpretation." *See Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011). *Chevron* may support the interpretation that the agency ultimately adopts, but it cannot salvage the Appeals Board's decision here.

The PBGC also argues that the question in this case is not whether the plan administrator *was* required to honor Fisher's request for a lump-sum payment, but whether the PBGC is *currently* obligated to honor such a request. Dkt. 17-1 at 19. But this argument simultaneously proves too little and too much. On the one hand, it is axiomatic that the question here is not what Fisher was owed under the terms of the Penn Traffic Plan but what he is owed now. On the other hand, there is considerable authority for the proposition that the PBGC must, in its role as trustee of a defunct plan, remedy any breaches committed by previous trustees. *See, e.g.*, *Vanderkam v. PBGC*, 943 F. Supp. 2d 130, 148 (D.D.C. 2013), *aff'd sub nom. VanderKam v.*

*VanderKam*, 776 F.3d 883 (D.C. Cir. 2015); *Stephens v. U.S. Airways Grp.*, 555 F. Supp. 2d 112, 119 (D.D.C. 2008), *rev'd in part on other grounds*, 644 F.3d 437 (D.C. Cir. 2011); *see also* 29 U.S.C. § 1105(a)(3) (providing that an ERISA fiduciary is liable "if he has knowledge of a breach by . . . [an]other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach").

In any event, the Court need not resolve the nature and scope of the PBGC's obligations here, because it is clear that the Appeals Board considered the agency bound to remedy—at least to some extent—those errors made by the plan administrator.  It explained that the PBGC "will generally pay benefits that were due and payable as of a plan's termination date," at least where permitted by the plan's assets and by applicable law.  Dkt. 24-1 at 6 (Appeals Board Decision at 5).  Its decision not to honor Fisher's request for a lump-sum payment rested not on a conclusion that the PBGC was not obligated to pay those benefits due under the plan, but that applicable law—namely, § 1341—superseded any such obligation.  If it is the PBGC's position that the Appeals Board erred in this respect, it may press that position before the Appeals Board in the first instance.

For these reasons, the Court will remand this matter to the PBGC for further proceedings consistent with this opinion.  The Court emphasizes two points, however, about the scope of this opinion.  First, nothing here should be read to cast doubt on the agency's interpretation of § 1341 as embodied in Policy 5.4-9 and as applied to a request for lump-sum benefits that is *made* (but is not *denied*) before a notice of plan termination is submitted to the PBGC.  The validity of that interpretation is not before the Court today.  Second, nothing here should be read to suggest that the agency in fact acted outside its authority in denying Fisher's request for a lump-sum payment.  It is well settled that agency action that is "well within the agenc[y's] scope of

authority" but is "not supported by the reasons that the agenc[y] adduce[s]" must be set aside. *Allentown Mack*, 522 U.S. at 374.  Without opining on the scope of the PBGC's authority, the Court emphasizes that its decision to set aside the Appeals Board's decision is based solely on the agency's failure to explain adequately its resolution of Fisher's statutory and regulatory challenges.  If the Appeals Board concludes on remand that Fisher was entitled to a lump-sum payment for reasons not provided—or not fully explicated—in its prior opinion, Fisher may seek review of that decision and the Court will, at that time, evaluate Fisher's claims (as well as the agency's response) on the merits.

## CONCLUSION

For these reasons, the Court hereby **GRANTS** Fisher's motion for summary judgment, Dkt. 16, **DENIES** the PBGC's motion for summary judgment, Dkt. 17, and **DENIES** as moot Fisher's motion under Federal Rule of Civil Procedure 56(d), Dkt. 19.  The case is remanded to the PBGC for further proceedings consistent with this Memorandum Opinion.

A separate Order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 25, 2016