## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSEPH v. FISHER,

*Plaintiff*,

v.

PENSION BENEFIT GUARANTY
CORPORATION,

*Defendant*.

Civil Action No. 14-1275 (RDM)

## <u>MEMORANDUM OPINION</u>

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, "was enacted to promote the interests of employees and their beneficiaries in employee benefit plans . . . and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (citations and quotations omitted). "Toward this end, Title IV of ERISA, 29 U.S.C. § 1301 *et seq.*, created a plan termination insurance program, administered by the Pension Benefit Guaranty Corporation (["PBGC" or "the Corporation"]), a wholly owned [g]overnment corporation within the Department of Labor." *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). The Corporation administers the program by "collect[ing] insurance premiums from covered pension plans and provid[ing] benefits to participants in those plans if their plan terminates with insufficient assets to support its guaranteed benefits." *Id.*

"Because plan termination can cause significant hardships for participants and substantial liabilities for [the] PBGC, ERISA outlines permissible plan termination procedures in considerable detail." *In re Pension Plan for Emps. of Broadway Maint. Corp.*, 707 F.2d 647, 648 (2d Cir. 1983). As relevant here, if a pension plan is unable to meet its obligations, it may

be terminated under what is called "distress termination," and the "PBGC becomes trustee of the plan, taking over the plan's assets and liabilities." *PBGC v. LTV Corp.*, 496 U.S. 633, 637, 639 (1990). ERISA imposes several requirements that a plan administrator must satisfy in order to enter distress termination, and also dictates that, after submitting a notice of intent to terminate ("NOIT"), an administrator must generally pay plan benefits only in the form of an annuity. 29 U.S.C. § 1341(c)(3)(D)(i)(I). As the Court explained in a prior opinion, "[t]his case is about the administrator's obligations in the period *before* it provides notice of termination." *Fisher v. Pension Benefit Guar. Corp.*, 151 F. Supp. 3d 159, 161 (D.D.C. 2016) ("*Fisher I*") (emphasis in original).

Plaintiff Joseph Fisher is a former executive of a company that sponsored a pension plan governed by ERISA. *Id.* at 163. After the company declared bankruptcy, but before the plan submitted a NOIT, Fisher requested that his pension benefits be paid in a lump sum form. *Id.* The plan administrator denied his request on the ground that "applicable law prohibits the payment of lump sum distributions in anticipation of the termination of the Plan." *Id.* at 163–64. When Fisher's case eventually made it to the PBGC's Board of Appeals ("the Board" or "Appeals Board"), the Board concluded that Fisher was not entitled to a lump sum payment. *See id.* at 166. In *Fisher I*, the Court set aside that decision and remanded the case for further proceedings because the Board's decision failed to address three potentially dispositive issues: (1) the Board did not grapple with the fact that Fisher's request was *denied* (not merely submitted) before the NOIT and thus did "not fall within the plain terms" of the policy the Board had relied on; (2) "neither the policy nor the decision spoke to whether an administrator may *deny* [a lump sum] request *before* submitting a [NOIT];" and (3) the decision "wholly ignore[d] whether and how 29 C.F.R. § 4044.4 might apply to Fisher's claim." *Id.* at 168–70.

On remand, the Board concluded, *inter alia*, that the administrator correctly denied

Fisher's request for a lump sum because 29 C.F.R. § 4044.4 prohibits the distribution of plan

assets in anticipation of termination and also rejected Fisher's contention that § 4044.4(b) is

inconsistent with ERISA, as amended, and thus invalid.  Dkt. 49-1 at 2–4.  Following that

decision, Plaintiff filed an amended complaint, Dkt. 25, the PBGC answered, Dkt. 37, and the

parties now cross-move for summary judgment, Dkt. 40; Dkt. 41.  Fisher also moves in the

alternative for the opportunity to conduct discovery pursuant to Federal Rule of Civil Procedure

56(d).  Dkt. 45.  For the reasons explained below, the Court will **DENY** Fisher's motion for

summary judgment, Dkt. 40, will **DENY** Fisher's Rule 56(d) motion as moot, Dkt. 45, and will

**GRANT** the PBGC's cross-motion for summary judgment, Dkt. 41.

## I.  BACKGROUND

The Court has recounted much of the relevant factual background and procedural history

in its earlier memorandum opinion, *see Fisher I*, 51 F. Supp. 3d 159 at 161–65, and will only

summarize and add to that background as necessary here.

### A.      **Statutory and Regulatory Background**

In 1974, animated by concerns over the growth in size and the unregulated state of the

employee benefit plan sector, Congress passed the Employee Retirement Income Security Act of

1974, Pub. L. No. 93-406, 88 Stat. 829, 829 (codified at 29 U.S.C. § 1001 *et seq.*).  "Among the

principal purposes of this 'comprehensive and reticulated statute' was to ensure that employees

and their beneficiaries would not be deprived of anticipated retirement benefits."  *R.A. Gray &*

*Co.*, 467 U.S. at 720 (quoting *Nachman Corp. v. PBGC*, 446 U.S. 359, 361–62 (1980)).  In order

to accomplish this purpose, Title IV of ERISA created a plan termination insurance program,

administered by the PBGC.  *Id.*; *see* 29 U.S.C. § 1301 *et seq.*  That program protects plan

participants "by guaranteeing a class of 'nonforfeitable benefits,' [and by] reimbursing eligible participants or beneficiaries when a guaranteed plan terminates without sufficient funds." *Davis v. PBGC*, 734 F.3d 1161, 1164 (D.C. Cir. 2013) (quoting 29 U.S.C. § 1322(a)).  ERISA authorizes the PBGC to promulgate "rules[] and regulations "as may be necessary to carry out the purposes of [Title IV of ERISA]."  29 U.S.C. § 1302(b)(3).

"Because plan termination can cause significant hardships for participants and substantial liabilities for [the] PBGC, ERISA outlines permissible plan termination procedures in considerable detail." *In re Pension Plan for Emps. of Broadway Maint. Corp.*, 707 F.2d at  648. As relevant here, in 1986, Congress created a termination procedure for distressed plans as part of the Single-Employer Pension Plan Amendments Act of 1986 ("SEPPAA"), Pub. L. No. 99-272, §§ 11002, 11007, 100 Stat. 82 (codified in scattered sections 29 U.S.C. §§ 1301–1461). Under the procedure established by SEPPAA, if the PBGC finds that a plan has "insufficient assets to satisfy its pension obligations," the plan can enter "distress termination," *Davis*, 734 F.3d at 1164, 1166; 29 U.S.C. § 1341(c), which means that "the PBGC becomes trustee of the plan, taking over the plan's assets and liabilities," *LTV Corp.*, 496 U.S. at 637; 29 U.S.C. § 1341(c)(3)(B)(iii).  After a plan enters distress termination, the PBGC "uses the plan's assets to cover what it can," but "then must add its own funds to ensure payment of most of the remaining" benefits that are guaranteed by the termination insurance program.  *LTV Corp.*, 496 U.S. at 637.  A distress termination will frequently occur after a bankruptcy filing.  Dkt. 49-1 at 13 n.38 (citing 29 U.S.C. § 1341(c)(2)(B)(i), (ii)).

SEPPAA established several requirements a plan administrator must satisfy to enter distress termination.[1]  Among other things, a plan administrator must provide sixty days' notice to all affected parties, including participants and the PBGC—an event known as a notice of intent to terminate or a "NOIT".  29 U.S.C. § 1341(a)(2), (c)(3)(D)(i)(I).  Once the plan has provided the PBGC with a NOIT, the PBGC determines whether the plan has sufficient assets to pay all, some, or none of its liabilities.  *Id.* § 1341(c)(3)(A)–(C).  SEPPAA also imposes certain requirements that apply during the "interim period" commencing after the date the plan submits a NOIT and ending on the date the PBGC issues a notice concerning its determination of the plan's eligibility for distress termination.  *See* 29 U.S.C. § 1341(c)(3)(D).  Central to this case, SEPPAA requires that, during that interim period, the administrator "pay benefits attributable to employer contributions, other than death benefits, only in the form of an annuity."  29 U.S.C. § 1341(c)(3)(D)(ii)(II).  In other words, no lump sum payments during the interim period.

In addition to setting out detailed termination procedures, ERISA also "requires that plan assets be distributed to participants in accordance with the six-tier allocation scheme set forth in § 4044(a)."  *Mead Corp. v. Tilley*, 490 U.S. 714, 717 (1989) (citing 29 U.S.C. § 1344(a)).  In particular, ERISA sets out "six categories, in descending order of priority, to which the Corporation must allocate a terminated plan's assets upon its termination."  *Lewis v. PBGC*, 314 F.Supp.3d 135, 142 (D.D.C. 2018).  "All benefits allocated to the first category must be met before any benefits in the second [category] are paid and so on until all assets are distributed."[2]

---

[1]  When discussing the requirements for distress termination, the Court uses SEPPAA and ERISA interchangeably.

[2]  The six-tiers are as follows:

   1. Benefits attributable to voluntary employee contributions;
   2. Benefits attributable to mandatory employee contributions;

*Victor v. Home Sav. of Am.*, 645 F. Supp. 1486, 1491 (E.D. Mo. 1986).  This priority scheme is intended to ensure an equitable distribution of the plan's assets upon termination.  *See* H.R. Rep. 93-533, *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4660 ("An equitable priority distribution of assets would be provided upon plan termination.").  "If there are insufficient assets to meet the obligations in a given category, the assets available for this priority level are allocated *pro rata* in proportion to the present value of the benefits at this priority level."  *Victor*, 645 F. Supp. at 1491.  Moreover, the first four categories are guaranteed by the PBGC; "[i]f the plan assets are not sufficient to cover the benefits in categories 1–4, the PBGC will make up the difference," and the "employer must then reimburse the PBGC for the unfunded benefit liabilities."  *Mead Corp*, 490 U.S. at 718.

ERISA authorizes the PBGC to promulgate "rules[] and regulations . . . as may be necessary to carry out the purposes of [Title IV of ERISA]."  29 U.S.C. § 1302(b)(3).  Pursuant to that authority, the PBGC has implemented an array of regulations that implement Title IV, several of which are relevant here.  First, shortly after ERISA's enactment, the PBGC found that lump sum pension benefits "do not conform to the fundamental concept of a guaranteed benefit," but also recognized that it would be "unfair" to treat lump sum "benefits as not qualified [under ERISA] because . . . in most instances . . . plan participants . . . may have had little voice in the [plan sponsor's choice to pay benefits in the lump sum form]."  Guaranteed Benefits, 40 Fed.

---

3. Benefits that have been in pay status for the three-year period before plan termination or that would have been in pay status if the eligible participant had retired;
4. Benefits generally that are guaranteed by the PBGC;
5. Benefits that are vested (other than by reason of plan termination); and
6. All other benefits under the plan.

*See In re Braniff Airways, Inc.*, 27 B.R. 222, 227 (Bankr. N.D. Tex. 1982) (discussing § 4044, which was then codified at 29 C.F.R. § 2618.4(b)).

Reg. 24206, 24207 (June 5, 1975).  The PBGC thus decided that in those cases, the PBGC would pay the benefit, but only in the form of an annuity, *see id.*; that rule is now codified at 29 C.F.R. § 4022.7.  Second, the PBGC has promulgated a rule that mirrors ERISA's prohibition on administrators paying lump sum payments during the interim period after a NOIT has been submitted.  *See* 29 C.F.R. § 4041.42(b)(2) (prohibiting plan administrators from "[p]ay[ing] benefits attributable to employer contributions, other than death benefits, in any form other than as an annuity," as of "the first day [the administrator] issues a notice of intent to terminate").

Third, and central to this case, the PBGC promulgated a regulation in 1981 that effectuates the allocation priorities established by ERISA § 4044, 29 U.S.C. § 1344.  *See* Allocation of Assets in Non-Multiemployer Plans, 46 Fed. Reg. 9480, 9481 (Jan. 28, 1981) (codified at 29 C.F.R. § 4044.4) (explaining that the rule is intended to "minimize the possibility of abuse").  Under 29 C.F.R. § 4044.4(a), a plan administrator is prohibited from allocating or distributing plan assets "in a manner other than that prescribed in section 4044 of ERISA."  *Id.* Section 4044.4(b), meanwhile, introduces the concept of "[d]istributions in anticipation of termination."  *Id.* § 4044(b).  Under subsection (b), "[a] distribution, transfer, or allocation of assets to a participant . . . *made in anticipation of plan termination*, is considered to be an allocation of plan assets upon termination, and is covered by [§4044.4(a)]."  *Id.* (emphasis added).  Subsection (b) also sets forth the standard for determining "whether a distribution, transfer, or allocation of assets has been made in anticipation of plan termination."  *Id.*

**B.**     **Facts and Proceedings**

Fisher is a former executive of the Penn Traffic Company, a corporation that operated a chain of supermarkets throughout the Mid-Atlantic and New England.  *See* Dkt. 49-1 at 5, 8.[3] "Until it declared bankruptcy in 2003, Penn Traffic operated a retirement plan known as the Penn Traffic Plan" (the "Plan").  *Fisher I*, 151 F. Supp. 3d at 163 (citing AR 2 at 2).  That Plan "permitted employees, including Fisher, to withdraw benefits in the form of a lump sum payment upon retirement."  *Id.* (citing AR 55 at 27).  In May 2003, Penn Traffic filed for Chapter 11 bankruptcy, and, three months later, in August 2003, Fisher resigned.  Dkt. 49-1 at 5, 8.  Upon his resignation, Fisher "requested that the plan administrator pay his accrued benefits as a lump sum."  *Fisher I*, 151 F. Supp. 3d at 163 (citing AR 3, Ex. 1, at 1).  The next month, on September 29, 2003, Penn Traffic's Board of Directors voted to terminate the Penn Traffic Plan, and, in light of the impending termination, the Board of Directors directed the committee that administered the Plan to deny Fisher's pending request for benefits in the form of a lump sum payment.  Dkt. 49-1 at 11–12.  The committee informed Fisher by letter on October 17, 2003 that his request for a lump sum benefits payment had been denied, explaining that "the applicable law prohibits the payment of lump sum distributions in anticipation of the termination of the Plan."  *Id.* at 12.  Fisher then appealed the committee's denial of his request, but that appeal was never adjudicated by the committee.  *Id.*  "On November 19, 2003, over a month after Fisher was notified that his request for a lump sum distribution was denied, Penn Traffic submitted its notice of intent to terminate to the PBGC."  *Id.*

---

[3]  For the purposes of the pending motion, the parties filed a supplemental administrative record ("SAR 2"), Dkt. 49-1.  Because that document does not contain internal pagination, the Court has cited to the ECF-generated pagination.  In addition, where the Court has relied on facts described in *Fisher I*, it has provided the administrative record citations relied on in that opinion.

Six years later, on December 16, 2009, the PBGC sent Fisher a letter explaining that he was eligible for certain monthly benefits. *Id.* Fisher then challenged that decision, arguing, among other things, that "he was entitled to a lump sum payment of his retirement benefits under the plan, and that nothing in ERISA permitted the plan administrator (or the PBGC) to deny him such a payment." *Fisher I*, 151 F. Supp. 3d at 164 (citing AR 3 at 4–5). Specifically, he argued that ERISA prohibits lump sum payments only "beginning 'on the date on which the plan administrator provides a notice of distress termination,' and therefore that prohibition did not apply to his request, which had been denied before Penn Traffic submitted its notice." *Id.* (quoting 29 U.S.C. § 1341(c)(3)(D)(i)(I) and citing AR 3 at 4). He also "argued that 29 C.F.R. § 4044.4(b), which prohibits the distribution of assets "in anticipation of plan termination" is *ultra vires* and, in any event, inapplicable under the circumstances. *Id.* (citations omitted).

The PBGC Appeals Board issued its original decision on September 19, 2011, concluding, as relevant here, that Fisher was not entitled to a lump sum payment of benefits.[4] *Id.* On July 25, 2014, Fisher filed this action, seeking judicial review of the Board's decision and an order requiring the PBGC to pay his benefits in the form of a lump sum rather than as an annuity, Dkt. 1, and the parties later cross-moved for summary judgment, Dkt. 16; Dkt. 17. In *Fisher I*, the Court held that the Board had not adequately explained three key aspects of its decision. First, the Board had failed to grapple with the fact that Fisher's request had been not merely submitted but also denied before the NOIT was submitted and thus did "not fall within the plain terms" of the internal PBGC policy upon which the Board had relied. *Fisher I*, 151 F. Supp. at 168. Second, neither the internal policy nor the Board's 2011 decision "spoke to whether an

---

[4] Despite denying the request for a lump sum payment, the Board did grant Plaintiff's appeal as to the amount of his annuity, AR 2, and he has been "receiving a monthly PBGC-payable benefit of $866.54." Dkt. 49-1 at 4 n.4.

administrator may deny [a lump sum] request before submitting a notice of distress termination." *Id.* Third, the Board's 2011 decision "wholly ignore[d] whether and how 29 C.F.R. § 4044.4 might apply to Fisher's claim." *Id.* at 168–69.  Because the Board had failed to explain these potentially dispositive issues, the Court set aside its 2011 decision and remanded the case for further proceedings. *Id.* at 169–70.  A month after the Court issued its decision, Fisher moved for reconsideration, arguing, among other things, that the PBGC should be prohibited from relying on 29 C.F.R. § 4044.4(b) on remand because it would be an "impermissible post-hoc rationalization."  Dkt. 27 at 14.  The Court denied that motion.  Dkt. 31.

After the Court remanded the case, the Appeals Board issued a new decision respecting Fisher's request for a lump sum payment. *See* Dkt. 49-1 at 2–32.  In that decision, the Board concluded, as follows:

- PBGC regulation § 4044.4, which prohibits the distribution of assets "in anticipation of plan termination," applies to Mr. Fisher's lump sum payment request.  The former Plan Administrator correctly denied Mr. Fisher a lump-sum distribution of his Plan benefit in accordance with PBGC regulation § 4044.4.

- PBGC's prohibition in PBGC regulation § 4044.4 of lump-sum distributions in anticipation of termination is a valid exercise of PBGC's rulemaking authority, rather than an *ultra vires* rule (as Mr. Fisher claims).

- Because the Plan's former administrator correctly denied Mr. Fisher's lump-sum application based on PBGC regulation § 4044.4, a lump-sum benefit was not "due and payable" to him as of the Plan's termination date ("DOPT").  Consequently, PBGC is not required to treat Mr. Fisher's lump-sum payment request as a pre-termination liability of the Plan (*see* PBGC regulation § 4044.3) for purposes of PBGC's allocation of the Plan's assets as of the Plan's DOPT pursuant to ERISA § 4044.

- As provided under PBGC's regulation § 4022.7 and PBGC policy, PBGC cannot pay a lump-sum benefit to Mr. Fisher.  Instead, PBGC correctly is paying Mr. Fisher the annuity benefit he elected in accordance with the Plan's provisions and PBGC regulations, with his annuity benefit reduced by the guarantee limitations under ERISA § 4022 and PBGC regulation § 4022.

*Id.* at 4–5.  After the Appeals Board issued its decision, Plaintiff filed an amended complaint in the still-pending case before this Court.  Dkt. 25.  The parties now cross-move for summary judgment.  Dkt. 40; Dkt. 41.

## II.  LEGAL STANDARDS

In the normal course, summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law."  *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010), *aff'd*, 663 F.3d 476, 398 U.S. App. D.C. 314 (D.C. Cir. 2011) (quoting Fed. R. Civ. P. 56(c)).  "In a case involving review of a final agency action under the Administrative Procedure Act ["APA"], 5 U.S.C. § 706, however, the standard set forth in Rule 56(c) does not apply and summary judgment instead serves as a "mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review."  *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019) (quotation omitted).

Section 706(2)(A) of the APA allows a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Section 706(2)(A) sets out "[t]wo distinct but potentially overlapping standards of . . . review."  *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2012).  First, in deciding whether an agency's interpretation of a statute that it implements is "in accordance with law," courts apply the familiar *Chevron* framework.  *See Baystate Franklin Med. Ctr. v. Azar,* 950 F.3d 84, 92 (D.C. Cir. 2020) ("[I]t is under *Chevron*, not the APA arbitrary and capricious standard, that a court considers 'whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the

agency's interpretation 'is based on a permissible construction of the statute.'" (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, Inc., 467 U.S. 837, 842–44 (1984)).  Second, under "arbitrary and capricious review," the function of the district court is to determine whether "the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Id.* at 89 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## III.  ANALYSIS

### A.    Scope of Remand

As a threshold matter, Fisher presses an argument that the Court has already rejected. *See* Dkt. 31 at 2–3.  On remand, the PBGC rested its decision entirely on the validity and applicability of 29 C.F.R. § 4044.4(b).  *See* Dkt. 49-1 at 4–5.  Fisher contends that the PBGC's reliance on that regulation constitutes an impermissible "post-hoc rationalization" that the Court must disregard.  Dkt. 40 at 13–15. (quoting *Stewart v. Azar*, 366 F. Supp. 3d 125, 135 (D.D.C. 2019)).  In Fisher's view, because the Appeals Board "did not mention, let alone identify" § 4044.4 as the basis for its pre-remand decision, the PBGC "cannot now claim [that] the regulation" is the reasons for denying his "lump-sum request."  *Id.* at 15.  This argument fails on several scores.

First, although counsel cannot rely on post hoc rationalizations offered for the first time in litigation to justify an agency's decision, *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943), here, the Board issued a new decision, and, as a result, the explanations the PBGC now offers are contemporaneous, not *post hoc*, *see NAACP v. Trump*, 315 F. Supp. 3d 457, 467 n.7 (D.D.C. 2018) (noting that if an agency opts to issue a new decision on remand, the new explanations are

"contemporaneous and, consequently, not *post hoc*").  That the Board issued a new decision is apparent both by the nature of the Court's remand order and from the administrative record.  In remanding the case for further proceedings, the Court expressly contemplated that the PBGC would reconsider its "prior decision."  *Fisher I*, 151 F. Supp. 3d at 170 (noting that on remand, if the Board concluded that "Fisher was not entitled to a lump-sum payment *for reasons not provided* —or not fully explicated—in its *prior opinion*, Fisher may seek review of that decision" (emphasis added)); *see also id.* at 168 (citing *Fox*, 684 F.3d at 80, and *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006), cases where the remand order was for "reconsideration").  On remand, the Board did exactly that; after reconsidering the matter, it issued a new decision.  *See* Dkt. 49-1 at 31.

Fisher contends that the 2016 decision could not have been a new decision because the Appeals Board "did not consider any new facts."  Dkt. 44 at 12.  But he cites no authority for that novel proposition of law, nor is the Court aware of any precedent holding that an agency's remand decision only qualifies as a new decision if the agency considers new or additional evidence.  *Cf. Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 78–79 (D.D.C. 2011) (holding that, on remand, it was permissible for an agency to adopt a new interpretation of a regulation and apply it to the facts of the case even without considering additional facts).  Any doubt that the agency issued a new decision, moreover, is dispelled by the fact that the Court "set aside" the PBGC's prior decision.  *See Fisher I*, 151 F. Supp. 3d at 169–70.  Because the Board issued a new decision, "the post hoc framework . . . [is] inapplicable."  *Vanda Pharm., Inc. v. Food & Drug Admin.*, No. 19-cv-301, 2020 WL 516561, at *5 n.2 (D.D.C. Jan. 31, 2020).

Second, it is beyond dispute that "an agency's review on remand must be responsive to the court's mandate."  *Bean Dredging*, 773 F. Supp. 2d at 78.  In *Fisher I*, the Court set aside the

13

Board's 2011 decision because, among other things, that decision did not address "Fisher's challenge to 29 C.F.R. § 4044.4(b)." 151 F. Supp. 3d at 168.  Having remanded the case so that the Board could address § 4044.4(b), it would make little sense now to ignore the Board's consideration of that issue.  *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) ("Needless to say, if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives.").  As the Court has previously explained, the "'post hoc rationalization' rule 'is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made' but instead is 'a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers'" Dkt. 31 at 2–3 (quoting *Alpharma, Inc.*, 460 F.3d at 6).

Finally, it was Fisher who put § 4044.4(b) at issue; he challenged the administrator's decision on the ground that § 4044.4(b) was *ultra vires* and inapplicable.  *See* Dkt. 24-1 at 16. Having raised the issue in his appeal before the agency, Fisher cannot now protest that the Board considered and decided the question that he raised and that the Court ordered the PBGC to consider on remand.  *Fisher I*, 151 F. Supp. 3d at 169–70 (remanding to the agency for further proceedings consistent with the Court's opinion); Dkt. 31 at 3 (explaining that, given the history of this case, Fisher cannot "complain that the agency has sandbagged him" by addressing § 4044.4(b) on remand); *see also Bean Dredging*, 773 F. Supp. 2d at 78 ("[A]n agency is not restricted from reopening administrative proceedings after the grounds upon which it once relied are drawn into question by the reviewing court." (citing *PPG Indus., Inc. v. United States*, 52 F.3d 363, 366 (D.C. Cir. 1995)).

Fisher also advances two additional, less ambitious, procedural arguments, but neither fares any better.  He first contends that the Board's arguments based on 29 U.S.C. § 1345 exceeded the scope of the remand because that provision is "not mentioned in the Court's remand decision."  Dkt. 44 at 13.  But having challenged whether § 4044.4(b) is consistent with ERISA, Fisher cannot now fault the Board for employing traditional tools of statutory interpretation, including the structure of the statute, *see Kiewit Power Constructors Co. v. Sec'y of Labor*, No. 18-1282, 2020 U.S. App. LEXIS 15615, at *33 (D.C. Cir. May 15, 2020) ("At *Chevron* step two, the question for the court is whether the agency's interpretation is based on a permissible construction of the statute in light of its language, *structure*, and purpose" (emphasis added) (internal quotation makes and citations omitted)), to explain why its interpretation is a permissible one.  Fisher also protests that "the Appeal Board devoted multiple pages to factual information that is not relevant to the questions of statutory interpretation at issue."  Dkt. 40 at 23.  To the extent Fisher complains that these facts are irrelevant, that is a question of substance for the Court to decide.  To the extent he instead contends that the Board impermissibly considered additional facts, that contention fails on the law.  "It is beyond dispute that a reviewing court may allow an agency to supplement the record with additional evidence following remand."  *Butte Cnty. v. Chaudhuri*, 197 F. Supp. 3d 82, 88 (D.D.C. 2016) (quotation omitted).  If, as in this case, the court "does not require fact gathering on remand . . . the agency is typically authorized to determine, in its discretion, whether such fact gathering is needed."  *Id.* (quotation omitted).

The Court, accordingly, concludes that the Board did not rely on any impermissible post hoc rationalizations nor otherwise exceed the scope of the remand.

A.     **Section 4044.4(b)**

Fisher raises both facial and as-applied challenges to 29 C.F.R. § 4044.4(b).[5]  The Court

will address each in turn.

1.     *Facial Challenge*

Fisher first argues that § 4044.4(b) "is *ultra vires* and cannot be reconciled with ERISA."

Dkt. 40 at 15–18.  To resolve this challenge, the Court must resort to the familiar *Chevron* two-

step framework.  At *Chevron* step-one, the Court must "'employ[] traditional tools of statutory

construction,' to determine whether Congress has 'unambiguously foreclosed the agency's

statutory interpretation.'"  *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C.

Cir. 2011) (first quote quoting *Chevron*, 467 U.S. at 843 n.9), (second quote quoting *Catawba

Cty. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009)) (alteration in original).  "Because at *Chevron* step

one [the Court] alone [is] tasked with determining Congress's unambiguous intent," it must

conduct its analysis "without showing the agency any special deference."  *Id.* at 659–60.  If, after

exhausting the traditional tools of statutory interpretation, the Court "determine[s] that statutory

ambiguity has left the agency with a range of possibilities and that the agency's interpretation

falls *within* that range, then the agency will have survived *Chevron* step one," and the Court must

proceed to step two.  *Id.* at 660.  At *Chevron* step two, the Court's review is "highly deferential,"

*id.* at 665 (quoting *Nat'l Rifle Ass'n of Am. v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000)), and its

task is limited to determining whether the "agency's interpretation of the statute is 'reasonable,'"

---

[5]  The Appeals Board concluded that "[t]he language of Penn Traffic's October 17, 2003 letter to
Mr. Fisher indicates that the denial of his lump sum distribution request [was] based on PBGC
regulation § 4044.4."  Dkt. 49-1 at 17.  Plaintiff does not question this premise of the Board's
decision and, having reviewed the text of the letter and § 4044.4, the Court concludes that the
Board's reading of the letter was reasonable.  Significantly, the letter uses the operative
"anticipation of . . . termination" language introduced in § 4044.4(b).  *Id.* at 12.

*Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 13 (D.C. Cir. 2011) (quoting *Abington Crest Nursing &*

*Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 719 (D.C. Cir. 2009)).

At *Chevron* step one, the Court begins with "the language of the statute."  *United States*

*v. Wilson*, 290 F.3d 347, 352 (D.C. Cir. 2002).  The disputed provision, 29 U.S.C. § 1341(c)(1),

provides, as relevant here, that "[a] single-employer plan may terminate under a distress

termination only if" certain requirements are met.  It further commands that during the interim

period "commencing on the date on which the plan administrator provides a notice of distress

termination [("NOIT")] . . . and ending on the date on which the plan administrator receives [a

specified] notification," *id.* § 1341(c)(3)(D)(i)(I), the administrator must "pay[] benefits

attributable to employer contributions, other than death benefits, only in the form of an annuity,"

*id.* §1341(c)(3)(D)(ii)(II).

Fisher contends that this provision, §1341(c)(3)(D)(ii)(II), unambiguously precludes the

PBGC from restricting pre-NOIT lump sum payments.  *See* Dkt. 40 at 16–17.  His argument is

unpersuasive for several reasons.  To start, Fisher's reading of the statute ignores "the specific

context in which [the disputed] language is used."  *Wilson*, 290 F.3d at 353 (quoting *Robinson v.*

*Shell Oil Co.*, 519 U.S. 337, 341 (1997)).  Section 1341 concerns only the requirements a single-

employer plan must satisfy to enter distress termination and the procedures through which it may

accomplish that distress termination.  *See* 29 U.S.C. § 1341(c)(1) (providing that a "plan may

terminate under a distress termination only if [certain requirements are met]" and also that the

administrator must adhere to certain requirements during the interim period).  There is no reason

to presume, moreover, that the obligations imposed on plan administrators by § 1341 in the

context of a distress termination limit the PBGC's authority to regulate *pre*-NOIT allocations.  It

17

would be a stretch to conclude that § 1341(c)'s termination requirements and procedures unambiguously resolve what the PBGC can or cannot regulate *prior* to a NOIT.

Fisher's most substantial argument in favor of his reading of the statute is based on the *expressio unius* canon of statutory interpretation—that is, the principle that courts should generally "construe statutes to give meaning to the disparate inclusion of particular language." *Catawba Cty.*, 571 F.3d at 36. In his view, because § 1341(c) explicitly prohibits lump sum payments only *after* a NOIT has issued, the PBGC may not, in implementing other portions of ERISA, restrict lump sum payments that occur *before* a NOIT is issued. *See* Dkt. 44 at 9–10 ("*Expressio unius est exclusio alterius*"). But the *expressio unius* principle "hardly compels" the result that Fisher suggests. *Catawba Cty.*, 571 F.3d at 36. As the D.C. Circuit has recognized, whatever the general force of the *expressio unius* canon, it is "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Cheney R.R. Co. v. Interstate Commerce Comm'n*, 902 F.2d 66, 69 (D.C. Cir. 1990); *Catawba Cty.*, 571 F.3d at 36 ("[A] congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision *not to mandate* any solution in the second context, *i.e.*, to leave the question to agency discretion.'" (quoting *Cheney*, 902 F.2d at 69)). "For that reason, that Congress spoke in one place but remained silent in another, as it did here, 'rarely if ever' suffices for the 'direct answer' that *Chevron* step one requires." *Catawba Cty.*, 571 F.3d at 36 (quoting *Cheney*, 902 F.2d at 69).

Aside from the *expressio unius* canon, Fisher has little to say about why ERISA's text or structure unambiguously requires the result he favors. *See* Dkt. 40 at 16 (arguing that § 4044.4(b) is invalid because it inconsistent with the fact that Congress, in 29 U.S.C. § 1341(c)(3)(D), prohibited only post-NOIT lump sum payments). The PBGC, in contrast,

argues that other provisions of ERISA support its view that the statute leaves it with discretion to adopt rules respecting pre-NOIT lump sum payments. *See* Dkt. 41 at 13–14.  The PBGC points, in particular, to § 1345, which gives the PBGC the authority to recover the portion of a pre-termination lump sum payment that exceeds the amount that the participant would have received had the payment been made in the form of an annuity. *See* Dkt. 41 at 26 (discussing 29 U.S.C. § 1345).  As the PBGC correctly observes, "[i]t would be anomalous" for Congress to *require* that plan administrators make lump sum payments "in anticipation of termination" yet authorize PBGC to claw back those payments. *Id.* (citation omitted) (alteration in original).

Fisher disagrees, arguing that § 1345 is merely "an additional tool" the PBGC may use "if necessary" but that it does not move the line set by § 1341(c).[6]  Dkt. 44 at 10.  He also contends that PBGC's reading would mean that "no plan administrators could make any payments beyond the PBGC's guaranteed level in the three years prior to a plan's termination,

---

[6]  Pursuant to Federal Rule of Civil Procedure 56(d), Fisher alternatively requests that the Court defer its resolution of the pending cross-motions for summary judgment to allow him to conduct discovery "regarding the PBGC's recovery procedures, either in general or with respect to Penn Traffic participants' benefits in particular."  Dkt. 45 at 4–5.  The Court will deny this motion for three reasons.  First and foremost, the PBGC's general practices as to the recapture provision simply have no bearing on the question of statutory interpretation that is at-issue.  Whether the PBGC, as a general matter, actually exercises its authority under § 1345 does not illuminate what Congress intended to achieve by authorizing the Corporation to use that tool.  Second, as to § 1345's specific application in this case, the PBGC has already offered to stipulate that it has not sought to recover any portion of any lump sum paid by the Penn Traffic Plan. *See* Dkt. 21 at 3.  As explained below, even granting Fisher the assumption that it was the Plan's practice to pay lump sum requests promptly, that would do little to further his case.  Third, absent extraordinary circumstances, the Court must decide an APA challenge based on the administrative record, and Fisher has failed to make the type of demanding showing required before a court will authorize discovery in an APA case. *See Am. Petrol. Tankers Parent, LLC v. United States*, 952 F. Supp. 2d 252, 271 (D.D.C. 2013) (noting that, in APA cases, discovery is permitted only (1) upon "a strong showing of bad faith or improper motive"; or (2) "in the rare case in which the record is so bare as to frustrate effective judicial review" (quotation omitted)).

and that is simply not how benefits plans operate." *Id.* This latter contention is a bit of a straw man. The PBGC is not arguing that § 1345 means that it will recover all excessive payments made in the three-year period preceding termination; rather, it argues only that, if Congress gave the PBGC the discretion to do so, it is unlikely that Congress intended to deprive the PBGC of the more efficient and less disruptive tool of preventing certain excessive payments from being made in the first place. *See* Dkt. 48 at 9. To be sure, one might argue that § 1345 supports Fisher's view. By allowing the PBGC to recapture lump sum payments after the fact, ERISA contemplates that such lump sum payments might be made. But the fact that Congress anticipated that payments might be made in circumvention of the ERISA allocation rules does not mean that Congress intended to preclude the PBGC from preventing or limiting such payments before they are made. In any event, even if Fisher's conception of the role played by § 1345 were plausible, it would not unambiguously foreclose the PBGC's more sensible reading of the statute. *See, e.g.*, *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 290 (4th Cir. 2013) (observing that the mere existence of a plausible alternative reading of a statute is not dispositive at *Chevron* step one).

Moving beyond ERISA's text and structure, Fisher points to what he sees as the purpose of § 1341(c)—or, more precisely, the purpose of SEPPAA, which is the statute that introduced the relevant text, *see* Dkt. 40 at 16. According to Fisher, in enacting SEPPAA, Congress intended to "str[ike] a balance" between honoring the "benefit options" of plan participants and "protecting the PBGC from rising deficits." *Id.* This argument, however, is belied by ERISA and SEPPAA's statutory and regulatory history.

Since the time that ERISA was enacted in 1974, Pub. L. No. 93-406, 88 Stat. 829, it has required that, upon termination, plan administrators allocate the assets of the plan among

participants pursuant to six categories, which establish a descending order of priority. *See* 29 U.S.C. § 1344; *see also Lewis*, 912 F.3d at 607. "All benefits allocated to the first category must be met before any benefits in the second category are paid and so on until all assets are distributed." *Victor*, 645 F. Supp. at 1491. In 1981, the PBGC promulgated a rule, codified at 29 C.F.R. § 4044.4, to enforce the allocation scheme mandated in § 4044 of the Act.[7] *See* 46 Fed. Reg. 9480; 29 C.F.R. § 4044.4. Of particular importance here, the PBGC concluded that it could ensure that plan assets were distributed according to statutory allocation priorities only by regulating distributions made "in anticipation of termination;" otherwise, the allocation scheme could easily be evaded by distributing plan assets to lower priority categories shortly before termination. *See* 46 Fed. Reg. 9480, 9481 (Jan. 28, 1981) (explaining that the rule is intended to "minimize the possibility of abuse"); *see also In re Braniff Airways, Inc.*, 27 B.R. 222, 227 (Bankr. N.D. Tex. 1982) ("The purpose of [§ 4044.4] is to maintain the respective positions of the participants in a plan's assets and prevent a run on the bank.")[8]; *id.* (holding that the rule "prohibit[s] claims for distribution which are made at a time the participants know or should know that plan termination is a likely prospect").

Section 4044.4 is consistent with Congress's efforts, in several parts of ERISA, to thwart practices that unduly deplete plan assets (e.g., excessive payments), *see, e.g.*, 29 U.S.C. 1345 (authorizing the PBGC to "recapture" excessive payments), or that increase a plan's total liabilities (e.g., increase of plan benefits), *see, e.g.*, *id.* § 1322(b) (limiting the benefits the PBGC

---

[7]  Shortly after ERISA was enacted, the PBGC promulgated an interim rule that is the predecessor to 29 C.F.R. § 4044.4(b). *See* Interim Regulation on Allocation of Assets, 41 Fed. Reg. 48480, 48482 (Nov. 3, 1976).

[8]  At the time *In re Braniff Airways* was published, the rule was codified at 29 C.F.R. § 2618.4(b) (1981). *See* 27 B.R. at 227 (quoting the rule).

guarantees by amendments enacted shortly before termination), in the period immediately

preceding termination.  Section 4022 of ERISA, for example, provides that amendments made to

a plan less than five years before the plan's termination "may not be fully credited"—that is, the

PBGC may not guarantee those benefits.  *Boivin v. U.S. Airways, Inc.*, 446 F.3d 148, 152 (D.C.

Cir. 2006) (citing 29 U.S.C. § 1322(b)(1)(B));[9] *Rettig v. PBGC*, 744 F.2d 133, 152 (D.C. Cir.

1984) (noting that this provision was intended "to prevent 'ballooning' of benefits in anticipation

of termination").  Similarly, § 4045 of ERISA authorizes the PBGC to "recapture" payments a

plan administrator made "within the 3-year period immediately preceding" termination to the

extent those payments exceeded the benefit that the participant would have received as an

annuity.  *See* 29 U.S.C. § 1345.  These are just two examples, among many, of the tools that

Congress gave the PBGC to "protect the financial viability of its fund."  *See, e.g.*, *Deppenbrook*

*v. PBGC*, 778 F.3d 166, 168 (D.C. Cir. 2015) (noting that, in certain circumstances, the PBGC

may terminate a plan if it will cause an unreasonable "long-run loss" to the Corporation).

In the decade after ERISA's termination insurance program was created, Congress grew

increasingly concerned about the program's long-term financial viability.  *See, e.g.*, H.R. Rep.

No. 99-266, at 28 (1985) ("Steps must be taken to assure that the single-employer insurance

program is put back on a fiscally sound basis so that it will continue to be able to fulfill its

statutory purpose.").  Most notably, Congress found that ERISA's "[then-]current termination

insurance system in some instances encourage[d] employers to terminate pension plans, evade

their obligations to pay benefits, and shift unfunded pension liabilities onto [ERISA's]

termination insurance system and the other premium-payers."  SEPPAA, Pub. L. No. 99-272,

§ 11002, 100 Stat. 237 (1986).  Against that backdrop, Congress enacted SEPPAA, "to assure the

---

[9]  Section 4022 of ERISA is codified at 29 U.S.C. § 1322.

prudent financing" of the termination insurance system.  *Id.*  To that end, SEPPAA increased

per-participant PBGC premiums, *see id.* § 11005; established certain, objective financial distress

criteria that plan sponsors must meet in order to terminate an underfunded plan, *see id.* §§

11008–11009; and increased the amount of liability that a plan sponsor incurs when its plan

enters distress termination, *id.* § 11011.

In light of this history and contrary to Fisher's contention, there is little, if any evidence,

that SEPPAA addressed participants' interest in *pre*-termination payments.  To the contrary,

Congress sought to address practices that could "jeopardize the PBGC's long-term financial

stability," and, in particular was concerned about practices that could undermine the PBGC's

ability to guarantee that participants receive benefits *after* a plan has terminated.  *See* H.R. Rep.

99-266, at 35 (explaining that the purpose of SEPPAA was to "close obvious loopholes in

[ERISA] which, if left unattended, could jeopardize the PBGC's long-range financial stability").

Thus, if anything, the history and purpose of SEPPAA cuts against Fisher's reading.  As the

PBGC notes, it would be "illogical" to read SEPPAA, which sought to shore up the financial

stability of the termination insurance program, to require that plan administrators make lump

sum payments that might deplete plan assets (or undermine the statutory allocation scheme)

shortly before termination.  *See* Dkt. 41 at 25; *cf.* H.R. Rep 99-266, at 50 (expressing concern

that "lump sum distributions of plan assets in a terminated plan . . . during the course of a

termination would dilute plan assets and may adversely affect participants benefits under Title

IV and the PBGC's recovery").

Recognizing that § 4044.4(b) predates SEPPAA, *see* Dkt. 40 at 17, Fisher advances a

theory of implied repeal: He does not argue that § 4044.4(b) was unlawful when the PBGC

adopted the rule in 1981, but only that it became unlawful with the enactment of SEPPAA.  In

particular, he contends that Congress "over[o]de" § 4044.4(b) by adopting the statutory

requirement that, during the interim period, a plan administrator may "pay benefits attributable to

employer contributions, other than death benefits, only in the form of an annuity," 29 U.S.C.

§ 1341(c)(3)(D)(ii)(II).  *See* Dkt. 40 at 16–17.  According to Fisher, because "Congress is

presumed to be aware of established practices and authoritative interpretations of the coordinate

branches," SEPPAA should be construed to displace § 4044.4(b).  *Id.* at 17 (quoting *Wilson*, 290

F.3d at 357).

The case that Fisher relies upon to advance this argument undermines rather than

supports his point.  In *United States v. Wilson*, the D.C. Circuit recognized that "Congress is

presumed to preserve, not abrogate, the background understandings against which it legislates."

290 F.3d at 356.  Applying that principle here, there is no reason to infer that Congress abrogated

rather than preserved § 4044.4(b) when it amended ERISA through SEPPAA.  The Court need

not conclude that Congress affirmatively ratified § 4044.4(b) when it enacted SEPPAA,

moreover, in order to reject Fisher's argument.  *Cf. Ohio v. U.S. Dep't of the Interior*, 880 F.2d

432, 458 (D.C. Cir. 1989) (discussing "acquiescence-by-reenactment").  It is sufficient to

conclude that Congress did not abrogate the rule.

Fisher does not dispute that, at the time the PBGC adopted § 4044.4, ERISA authorized

that regulatory action.  Under his theory, it was not until SEPPAA was enacted that Congress

rescinded that grant of regulatory discretion.  Framed in this manner, Fisher's argument

"encounter[s] head-on the 'cardinal rule . . . that repeals by implication are not favored.'"

*Morton v. Mancari*, 417 U.S. 535, 550 (1974) (quoting *Posadas v. Nat'l City Bank*, 296 U.S.

497, 503 (1936)); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (courts

recognize "the 'stron[g] presume[ption]' that repeals by implication are 'disfavored' and that

'Congress will specifically address' preexisting law when it wishes to suspend its normal operation in a later statute" (alterations in original)).  "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."  *Morton*, 417 U.S. at 550.  Here, even if that rule applies with less vigor where Congress has merely left an agency with discretion to fill a regulatory gap, Fisher has failed to offer any evidence that Congress intended to withdraw its delegation or that the relevant provisions of ERISA and SEPPAA conflict.

In summary, nothing in ERISA or in SEPPA's text, structure, history, or purpose "provide sufficient clarity to foreclose the [PBGC's] interpretation at *Chevron* step one."  *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 253 (D.D.C. 2015).  Accordingly, the Court proceeds to *Chevron* step two.

Fisher offers no argument at *Chevron* step two, *see* Dkt. 44 at 5, and for good reason.  Section 4044.4(b) clearly promotes ERISA's purpose by "'minimiz[ing] the possibility of abuse' . . . that could occur . . . during the time period when plan termination was anticipated but had not yet occurred."  Dkt. 49-1 at 17 (quoting 46 Fed. Reg. 9480, 9481 (Jan. 28, 1981)).  The statutorily mandated allocation rules would be subject to circumvention if plan administrators were free to make distributions without regard to the allocation scheme "in anticipation of termination."  29 C.F.R. § 4044.4(b).  Moreover, without such a rule, the PBGC would be required to devote its resources to clawing back pre-NOIT distributions made in contravention of the allocation scheme.  In a world in which Congress has granted the PBGC broad authority to adopt rules and regulations "relating to . . . the exercise of all other rights and powers granted to it by" ERISA, 29 U.S.C. § 1302(b)(3); in which Congress had mandated a post-NOIT allocation scheme that could be circumvented by lump sum and other distributions made in an anticipation

of termination; and in which Congress has provided the PBGC with "recapture" authority, *see* 29 U.S.C. § 1345, that would permit the Corporation to claw back certain pre-NOIT distributions, § 4044.4(b) easily clears the reasonableness hurdle.

The Court, accordingly, concludes that the PBGC's interpretation passes muster under *Chevron* step two.

    2.    *As-Applied Challenge*

Fisher argues, in the alternative, that § 4044.4(b) is inapplicable to his case.  Dkt. 40 at 18–20.  This challenge is subject to arbitrary and capricious review, which is "fundamentally deferential," *see Fox*, 684 F.3d at 75, and precludes the Court from "substitut[ing] its judgment for that of the agency," *Am. Inst. of Certified Pub. Accountants v. IRS*, 746 Fed. App'x 1, 12 (D.C. Cir. 2018) (quoting *State Farm*, 463 U.S. at 43).  To pass muster under this standard, "[t]he agency must have 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *State Farm*, 463 U.S. at 43) (second and third alterations in original).  Here, the PBGC's 2016 decision also clears this modest hurdle.

"In determining whether a distribution . . . of assets has been made in anticipation of plan termination" for purposes of § 4044.4(b), the PBGC "will consider all facts and circumstances including": (1) "Any change in funding or operation procedures;" (2) "Past practice with regard to employee requests for forms of distribution;" and (3) "Whether the distribution is consistent with plan provisions."[10]  29 C.F.R. § 4044.4(b).  In its 2016 decision, the Appeals Board concluded that several "circumstances demonstrate that the Plan's distress termination was a

_____

[10]  Section 4044.4(b) includes a fourth factor which Fisher concedes is not relevant here.  Dkt. 40 at 19 n.7.

likely prospect when the former Plan Administrator considered and denied . . . Fisher's lump sum [request]." Dkt. 49-1 at 19.  For one, Penn Traffic, the plan sponsor, Dkt. 49-1 at 5, had filed for bankruptcy "nearly three months before" Fisher made his request, and, "[s]hortly thereafter, the [c]ompany decided to stop making funding contributions to its pension plans."  *Id.* In addition, the same month that Fisher submitted his request, Penn Traffic received a funding estimate that showed that, "as of June 30, 2003" (six weeks before Fisher's request), the Plan had accrued a "funding deficit of $37,185,530."  *Id.*  These facts bear directly on the change-in-funding factor.  *See* 29 C.F.R. § 4044.4(b).

Most tellingly, at the same meeting that Penn Traffic resolved to deny Fisher's request, it also "resolved to terminate all of the [c]ompany's pension plans" due to the "financial difficulties that [it] was experiencing before and after its bankruptcy filing."  *Id.* at 20.  This constitutes clear evidence that Penn Traffic anticipated plan termination at the time it denied Fisher's request. And, even if the decision to terminate the plan was not enough to resolve the question, the Board also points to evidence that Penn Traffic had been "consider[ing] the need to terminate the Plan since the date the [c]ompany filed for bankruptcy, which occurred nearly three months before . . . Fisher" submitted his request.  *Id.* at 21.  These facts provide ample support for the Board's conclusion that the administrator properly denied Fisher's request as an impermissible distribution in anticipation of termination.

Fisher offers three responses, none of which is persuasive.  First, he argues that the Board misapplied the first factor listed in § 4044.4(b).  Dkt. 40 at 19.  As he reads that factor, the "question is not whether a lump sum payment would affect a plan's funding level . . . , but rather whether a lump sum payment would require a change in funding procedures."  *Id.*  But, as the PBGC persuasively explains, that interpretation is illogical: "It would mean that a plan's

deteriorating funding status would not signal the strong possibility of termination so long as there was no change in 'funding procedures'" and, conversely, "that a change in 'funding procedures' by a well-funded plan would indicate that the plan may soon terminate." Dkt. 48 at 6.  Fisher also contends that the second factor—the plan's past practices—cuts in his favor.  Dkt 40 at 19.  As he puts it, "the Plan's past practice with regard to employee requests for lump sums was to pay them promptly and routinely."  *Id.* (citing AR 3 at 2).  Even assuming this factor tilts in his favor, it does little to advance his cause.  As the Appeals Board explained, § 4044.4(b) does not require that all four to the factors be "satisfied in order for a violation . . . to occur."  Dkt. 49-1 at 23.  In addition, as the Board further explained, although other employees received lump sum distributions before and after Fisher's request was denied, he was not similarly situated to other employees—Fisher, who was Penn Traffic's President and Chief Executive Officer, Dkt. 49-1 at 21, was one of only three employees whose benefits fell within "ERISA's phase-in limitation," which applied "to the substantial benefit increase he received under the Plan's Second Amendment," *id.* at 23 & n.72.  "The phase-in limitation [did] not similarly affect the PBGC-guaranteed benefits that [were] payable to other Plan participants upon Plan termination because the Second Amendment applied only to Mr. Fisher."  *Id.* at 23.

The Court therefore concludes that the Board's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).[11]

---

[11]  Having concluded that it will grant the PBGC's motion for summary judgment, the Court will deny as moot Fisher's request that it strike the PBGC's affirmative defense.  *See* Dkt. 40 at 26.

## CONCLUSION

For these reasons, Fisher's motion for summary judgment, Dkt. 40, and his Rule 56(d) motion, Dkt. 45, are hereby **DENIED**, and the PBGC's motion for summary judgment, Dkt. 41, is hereby **GRANTED**.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 31, 2020